# Syllabus

Chief Justice:
Megan K. Cavanagh

Justices:
Brian K. Zahra
Richard H. Bernstein
Elizabeth M. Welch
Kyra H. Bolden
Kimberly A. Thomas
Noah P. Hood

**This syllabus constitutes no part of the opinion of the Court but has been prepared by the Reporter of Decisions for the convenience of the reader.**

Reporter of Decisions:
Kimberly K. Muschong

## PEOPLE v JADE

Docket No. 167920. Argued January 21, 2026 (Calendar No. 2). Decided July 31, 2026.

Jayneel R. Jade pleaded guilty in the Van Buren Circuit Court to accosting a child for immoral purposes, MCL 750.145a. Defendant responded to an advertisement posted on a website by sheriff's deputies working as part of a two-county joint task force to conduct child sex trafficking reverse sting operations. The advertisement depicted a woman whose age was listed as 20, but who was actually an 18-year-old woman working in law enforcement, and described various sexual activities that "this service provider may enjoy." During a text message chat between defendant and a decoy, the decoy asked defendant if he was "cool with younger chicks" and stated that she was 15 years old. Defendant responded, "Got to be 16," and when the decoy reiterated that she was "actually 15," defendant asked if they could talk on the phone. Defendant and the decoy had a phone conversation, which was not recorded. After the phone call, the text chat resumed, and the decoy asked if defendant was "cool with $80" for oral sex and intercourse. Defendant did not respond directly, but instead asked the decoy if she would like to go out to eat. The decoy directed the text conversation back to sex for money, and shortly thereafter, defendant arrived at a hotel room where an undercover officer was present. Defendant was arrested by police officers upon entering the room and was subsequently charged with one count of accosting a child for immoral purposes, one count of child sexually abusive activity, MCL 750.145c(2)(a), and two counts of using a computer to commit a crime, MCL 752.796.

Defendant moved to dismiss the charges on the ground of entrapment, and the trial court held an evidentiary hearing where it applied Michigan's two-prong entrapment test. Following the hearing, the trial court, Kathleen M. Brickley, J., concluded that defendant had failed to satisfy either prong of the test and denied his motion to dismiss. Defendant filed an interlocutory appeal in the Court of Appeals, and while the appeal was pending, defendant pleaded guilty to accosting a child for immoral purposes in exchange for dismissal of the other charges. The Court of Appeals (BORRELLO, P.J., and LETICA, J.; MURRAY, J., concurring) affirmed the trial court's decision in an opinion issued on October 28, 2024 (Docket No. 365951). Defendant applied for leave to appeal in the Supreme Court, which granted the application. ___ Mich ___; 20 NW3d 867 (2025).

In an opinion by Justice HOOD, joined by Chief Justice CAVANAGH and Justices BERNSTEIN, WELCH, BOLDEN, and THOMAS, the Supreme Court *held*:

1.  A trial court's factual findings following an entrapment hearing are reviewed for clear error, and its ultimate legal determination regarding whether entrapment occurred and its resolution of any underlying legal questions are reviewed de novo. There is a discrepancy in Michigan's entrapment caselaw between this Court's longstanding acknowledgment that entrapment is a matter of law and the Court's prior recognition of a clear-error standard for entrapment decisions that failed to distinguish between factual and legal determinations. To the extent that prior opinions suggest otherwise, it is now necessary to clarify that only factual findings in an entrapment context are reviewed for clear error, while the ultimate entrapment determination and any other legal determinations are reviewed de novo.

2.  Under the unlawful-inducement prong of the test used to analyze entrapment claims, a court must consider a defendant's readiness and willingness to commit the charged crime. Under the current modified objective entrapment test in Michigan, a defendant is considered entrapped if either (1) the police engaged in impermissible conduct that would induce a law-abiding person to commit a crime in similar circumstances (unlawful inducement), or (2) the police engaged in conduct so reprehensible that it cannot be tolerated (reprehensible conduct). The unlawful-inducement inquiry is objective, focusing on a hypothetical person, and may be assessed by considering 12 nonexhaustive factors, set forth in *People v Johnson*, 466 Mich 491, 498-499 (2002), including whether the police engaged in escalation, pressure, targeting, and offers of excessive consideration. Additionally, the trial court must ask whether the police conduct went beyond merely offering an opportunity to commit a crime and instead involved tactics that could have induced or instigated the criminal act by a hypothetical law-abiding person in the defendant's circumstances who was not otherwise ready and willing to commit the offense. While a court must consider a defendant's readiness and willingness to commit the charged crime, readiness and willingness and "mere opportunity" are not separate elements that must be independently established. Rather, the phrase "ready and willing" is a conceptual expression of the objective-causation inquiry and serves as a way to identify whether the cause of the offense came from law enforcement rather than the defendant.

Under the reprehensible-conduct prong, police conduct must be more reprehensible than conduct under the unlawful-inducement prong. This prong may be met without regard to causation so long as the conduct in question is egregious enough to be intolerable by a civilized society, and it requires an inquiry into whether the police conduct falls below standards for the proper use of governmental power.

3.  Escalatory conduct constitutes entrapment under the unlawful-inducement prong if it would induce a law-abiding person in similar circumstances to commit the offense, while escalation constitutes entrapment under the reprehensible-conduct prong if it falls below standards, to which common feelings respond, for the proper use of governmental power. Further, escalation from a less serious offense to a more serious offense may itself establish entrapment. The core principle of escalation applies whenever police conduct transforms a suspect's apparent willingness to commit a less serious offense into exposure for a more serious, different-order offense. But there is no escalation constituting entrapment when the police simply give a suspect another opportunity to commit the same offense that the suspect previously committed, or when the police delay arresting the suspect when the effectiveness of a legitimate, ongoing undercover investigation depends on the delay.

4. The Court of Appeals applied an incorrect standard of review, and remand is required under the newly clarified legal standard because the trial court did not consider the full impact of the police conduct escalating the interaction with defendant so that he could be charged with a more serious offense. After defendant stated during the text conversation that his interlocutor must be at least 16 years old, he had provided grounds to satisfy the elements of a lesser crime, such as engaging the services of a person under the age of 18 for purposes of prostitution under MCL 750.449a(2). The police may have had a sufficient basis to pursue a charge but continued until more charges could be filed, which raises concerns under the clarified entrapment framework. On remand, the trial court is to consider the escalatory nature of the police conduct, including the increase in offense and punishment between the crime defendant was ready and willing to commit and the crimes with which he was ultimately charged.

Court of Appeals opinion vacated, and case remanded to the trial court.

Justice WELCH, concurring, wrote separately to explain that the reprehensible-conduct prong could apply to police operations like the one at issue here and to describe what constitutes impermissible escalation. The two prongs of Michigan's entrapment test share the same policy rationale but identify unacceptable police behavior in different ways. The reprehensible-conduct prong asks whether courts ought to tolerate investigative tactics, even if the defendant might have been predisposed to commit the crime. The tactics used by investigators in sting operations similar to the one here could evince an intent to "get up a prosecution" against defendants, which is the very scandalous and reprehensible behavior that the entrapment doctrine is intended to prevent. Further, the identity of the subjects of an investigative scheme, including the possibility that an investigation singles out a specific group when compared to the general population, could be relevant to determining whether the police engaged in reprehensible conduct that cannot be tolerated.

Additionally, Justice WELCH noted that caselaw has previously addressed escalation under the unlawful-inducement prong, but the majority opinion acknowledges that it is also relevant under the reprehensible-conduct prong. In analyzing whether police conduct has escalated criminal conduct, a judge must focus on the police officers' conduct, not the defendant's state of mind. But this conduct should not be viewed in a vacuum, and the court may also consider the defendant's criminal history, the transactions preceding the offense, the suspect's response to law-enforcement inducements, the gravity of the crime, and the difficulty of detecting instances of its commission. Courts might also consider the nature of the sting operation and whether the communications with the defendant were designed to appeal to people engaged in lawful conduct or unlawful conduct, as well as the needs and purposes of the investigation.

Justice ZAHRA, concurring in part and dissenting in part, agreed that a trial court's factual findings are reviewed for clear error and that its ultimate entrapment determination and any other legal determinations are reviewed de novo; that the phrase "ready and willing" is not an added element to the inducement prong; that conduct that seeks to escalate a defendant's criminal liability is relevant to whether police conduct was so reprehensible that it cannot be tolerated; and that remand was required because the trial court appeared to have only considered whether police conduct escalated defendant's sentence without considering whether police conduct had escalated a misdemeanor charge to the felony crimes charged. Otherwise, he dissented, and would apply

the clarified standard of review and conclude that the Court of Appeals correctly affirmed the trial court's legal conclusion that defendant did not establish that police misconduct would have induced a law-abiding person under similar circumstances to commit the charged offenses. The police conduct here could not reasonably be viewed as an incentive, let alone an inducement, for a normally law-abiding person to commit the crimes charged. Additionally, police conduct relating to escalation was not relevant here to the inducement prong. Police insistence to commit a crime may be relevant to inducement, but escalation alone, in this context, is not an inducement. The continued operation by law enforcement did not induce defendant to commit the charged crimes or make him more "ready and willing" to commit them. The escalation in this case only involves potential police misconduct, which is determined under the reprehensible-conduct prong of entrapment.

# OPINION

Chief Justice:
Megan K. Cavanagh

Justices:
Brian K. Zahra
Richard H. Bernstein
Elizabeth M. Welch
Kyra H. Bolden
Kimberly A. Thomas
Noah P. Hood

FILED July 31, 2026

STATE OF MICHIGAN

SUPREME COURT

PEOPLE OF THE STATE OF MICHIGAN,

       Plaintiff-Appellee,

v                                          No. 167920

JAYNEEL RAVINDRA JADE,

       Defendant-Appellant.

---

BEFORE THE ENTIRE BENCH

HOOD, J.

This case is about entrapment. Defendant, Jayneel Ravindra Jade, was convicted of accosting a child for immoral purposes, MCL 750.145a, following a law enforcement child sex trafficking sting operation. In the trial court, Jade moved to dismiss the charges on the ground of entrapment. The trial court denied the motion, and the Court of Appeals affirmed, concluding that the trial court correctly determined that entrapment did not occur. Jade sought leave to appeal, which we granted.

Three questions are presently before this Court: first, whether appellate courts must review a trial court's ultimate determination of entrapment de novo or for clear error; second, whether Michigan courts should rely on the legal standard that the police do not engage in entrapment by merely presenting a defendant with an opportunity to commit the crime with which they were charged without considering the defendant's readiness and willingness to commit the charged crime; and third, whether the Court of Appeals erred by affirming the trial court's determination that Jade was not entrapped.

We hold that the Court of Appeals applied an incorrect standard of review and erred in affirming the trial court's analysis because the trial court did not properly consider whether police tactics escalated Jade's conduct. We now clarify the proper standards of review for entrapment determinations and the framework for evaluating entrapment claims but do not reach the ultimate question of whether Jade was entrapped as a matter of law. We hold that a trial court's factual findings in an entrapment hearing are reviewed for clear error, while its ultimate legal determination as to whether entrapment occurred and any other legal determinations are reviewed de novo.

Michigan applies a two-prong, modified objective test for entrapment under which a defendant is entitled to dismissal of charges if either prong is satisfied. First, under the "unlawful inducement" prong, courts examine whether police conduct exceeded the mere offering of an opportunity to commit a crime and instead involved tactics that could have induced or instigated the criminal act by a hypothetical law-abiding person in the defendant's circumstances who was not otherwise ready and willing to commit the charged offense. This analysis draws from the objective test adopted in *People v Turner*, 390 Mich 7, 20-22; 210 NW2d 336 (1973), guided by Justice Stewart's formulation in *United States*

*v Russell*, 411 US 423, 445; 93 S Ct 1637; 36 L Ed 2d 366 (1973) (Stewart, J., dissenting), and refined through the split opinions in *People v Jamieson*, 436 Mich 61, 74, 78-80; 461 NW2d 884 (1990) (opinion by BRICKLEY, J.); *id*. at 94-96 (M. F. CAVANAGH, J., concurring), and *People v Juillet*, 439 Mich 34, 55-57; 475 NW2d 786 (1991) (opinion by BRICKLEY, J.); *id*. at 70-76 (opinion by M. F. CAVANAGH, C.J.). *People v Johnson*, 466 Mich 491, 498-499; 647 NW2d 480 (2002), consolidated this objective framework by providing nonexhaustive factors to help identify conduct amounting to unlawful inducement, such as escalation, pressure, targeting, and offers of excessive consideration. We clarify that the phrase "ready and willing," *Jamieson*, 436 Mich at 68 (opinion by BRICKLEY, J.), functions only as a conceptual articulation of the objective-causation inquiry. It is meant as a tool to help courts distinguish police inducement from a defendant's independent agency or predisposition and does not add any additional element to the inducement prong.

Second, under the "reprehensible conduct" prong, entrapment occurs when governmental actors engage in conduct so egregious that it "cannot be tolerated" because allowing the conviction to stand would endorse a misuse of governmental power. *Johnson*, 466 Mich at 498. This prong preserves *Turner*'s core insight that entrapment doctrine exists to ensure that law enforcement agents detect crime rather than manufacture it. *Turner*, 390 Mich at 20. The reprehensible-conduct prong concerns police conduct more egregious than that required for inducement, reflecting the understanding articulated in *Juillet*, 439 Mich at 74-78 (opinion by M. F. CAVANAGH, C.J.), that certain police tactics may violate fundamental standards even absent inducement.

3

Together, these two prongs form Michigan's modern entrapment doctrine, which is adjudicated at an evidentiary hearing before the trial court under the procedures established in *People v D'Angelo*, 401 Mich 167, 177-180; 257 NW2d 655 (1977). At that hearing, the defendant bears the burden of proving entrapment by a preponderance of the evidence because the defense "places the defendant in an accusatorial posture upon an issue which . . . is irrelevant to his guilt or innocence." *Id*. at 180, 183.

This opinion clarifies both prongs of the modified objective test and the proper framework for evaluating entrapment claims under Michigan law. Furthermore, where the record reflects a defendant's willingness to commit a lesser offense not charged—one materially less serious than the offense actually charged—we clarify that trial courts must consider whether law enforcement escalated the defendant's conduct from the lesser offense for which there was clear willingness to the more serious charged offense.

We vacate the Court of Appeals' application of clear-error review to the ultimate entrapment determination and vacate its decision affirming the trial court's conclusion that Jade was not entrapped. We remand to the trial court for further proceedings consistent with this opinion.

## I. BACKGROUND

This case started with a child sex trafficking reverse sting operation in Van Buren County. A joint task force composed of the Van Buren and Genesee County Sheriff's Departments conducted the sting. The Genesee County Sheriff's Department's Genesee Human Oppression Strike Team (GHOST) has worked with several counties throughout the state to administer sting operations. The two departments organized the task force so

4

Van Buren officers could observe how Genesee officers conduct reverse sting operations. But the Genesee officers did not provide the Van Buren officers with written policies or procedures before the sting operation at issue in this case.

In April 2022, the joint task force used the website "Skip the Games" to conduct the sting operation. Testimony during an evidentiary hearing characterized the website as "almost like a Craigslist" for escorts. The website stated that it was meant for adults, that it explicitly prohibited minors, and that its policies required users to be at least 19 years old to post material. But the website lacked an age-verification process. Furthermore, the website stated that Skip the Games cooperates with law enforcement and that law enforcement officials do not need search warrants to request information "if minors are involved."

As part of the sting operation, deputies posted an advertisement on Skip the Games. The advertisement depicted a woman who was listed as 20 years old and described various sexual activities that "this service provider may enjoy." The woman pictured in the advertisement was actually an 18-year-old woman working in law enforcement. The advertisement also had a photograph that stated, "I [heart] DILFs," which, according to one of the witnesses, stands for "dad[]s I'd like to F."

The Van Buren detective who was the lead officer in this case acknowledged in the trial court that Genesee officers did not provide Van Buren officers with "any written policies, procedures, manuals or training with respect to dos and don'ts for these types of investigations[.]" She further testified that she had no previous knowledge of Skip the Games or why Genesee officers had used it. She had no experience in these types of sting operations.

5

Jade responded to the deputies' advertisement on Skip the Games. The following chat ensued via text message:

[*Jade*] [1:20 p.m.]: Hey there

[*Decoy*] [1:43 p.m.]: Hi

[*Jade*] [1:51 p.m.]: How are you doing?

[*Jade*] [1:52 p.m.]: How long are you visiting Paw Paw?

[*Decoy*] [1:55 p.m.]: Just fonight [sic]

[*Decoy*] [1:55 p.m.]: Tonight

[*Jade*] [1:57 p.m.]: Is that you too with the 517 phone number?

[*Jade*] [1:58 p.m.]: Are you free this afternoon?

[*Decoy*] [2:03 p.m.]: Yup

[*Decoy*] [2:03 p.m.]: Yup its me

[*Decoy*] [2:04 p.m.]: Lol

[*Jade*] [2:35 p.m.]: Where would we meet at?

[*Decoy*] [2:40 p.m.]: In pawpaw

[*Decoy*] [2:40 p.m.]: Are you cool with younger chicks?

[*Jade*] [2:41 p.m.]: I am

[*Decoy*] [2:41 p.m.]: Ok cool cuz I'm 15

[*Jade*] [2:42 p.m.]: Got to be 16

At this point, Jade stated that his interlocutor must be at least 16 years old, potentially satisfying the elements of a lesser crime than the crimes with which he was eventually charged, such as engaging the services of a minor under MCL 750.449a(2), which prohibits paying "to engage the services of another person, who is less than 18 years

6

of age ..., for the purpose of prostitution, lewdness, or assignation ...."  But law enforcement continued to engage Jade, creating the possibility that he could be charged with higher offenses.  The chat continued:

[*Decoy*] [2:42 p.m.]: Nope

[*Jade*] [2:43 p.m.]: I'm cool if you are older than 15 and want to role play to be 15

[*Decoy*] [2:45 p.m.]: Sorry I[']m Actually 15

[*Decoy*] [2:45 p.m.]: Like real life lol

[*Jade*] [2:48 p.m.]: Can we talk on the phone?

[*Decoy*] [2:49 p.m.]: Yup I will call ya

[*Jade*] [2:52 p.m.]: Ok

At this point in the text exchange, Jade had a phone conversation with the law enforcement decoy.  The call was not recorded.[1]  Jade also searched the decoy's phone number on Google, and the results indicated that it was registered to a 34-year-old, unmarried woman with no children.[2]

---

[1] Multiple detectives who testified agreed that the call should have been recorded.  By the time of the entrapment hearing in the trial court, the decoy's memory of the call was faint.  But the parties' stipulated facts, which were entered in the trial court, state that "[t]he UC [undercover officer] did not recall the Defendant saying anything about sex for money."  The decoy further admitted that she was not trained to let suspects bring up sex first in her conversations with suspects.

[2] Months after Jade conducted this search, law enforcement performed a similar search and confirmed that one of the search returns was the same 34-year-old woman identified by Jade.  However, the search conducted by law enforcement also revealed that "multiple other people" were associated with the phone number.

The chat conversation continued after the phone call:

[*Decoy*] [2:58 p.m.]: So ur cool with $80 to fuck and get a bj

[*Jade*] [3:35 p.m.]: Hey

[*Decoy*] [3:36 p.m.]: Hey

[*Jade*] [3:36 p.m.]: Would you like to go out to eat instead of having instant noodles?

[*Decoy*] [3:37 p.m.]: I really just wanna fuck and make some cash

[*Jade*] [3:37 p.m.]: Can you come down to the back entrance?  I'm here

[*Decoy*] [3:38 p.m.]: Ok hang on

Shortly thereafter, Jade entered a hotel room where an undercover officer was present.  The officer was wrapped in a blanket that covered everything except her face.  The police promptly arrested Jade upon his entering the room.

On these facts, the prosecution charged Jade with (1) one count of child sexually abusive activity, MCL 750.145c(2)(a); (2) two counts of using a computer to commit a crime, MCL 752.796; and (3) one count of accosting a child for immoral purposes, MCL 750.145a.  Jade moved to dismiss the charges on the ground of entrapment.

Following an evidentiary hearing, the trial court applied Michigan's two-prong entrapment test.  See *Johnson*, 466 Mich at 498 ("Under the current entrapment test in Michigan, a defendant is considered entrapped if either (1) the police engaged in impermissible conduct that would induce a law-abiding person to commit a crime in similar circumstances or (2) the police engaged in conduct so reprehensible that it cannot be tolerated.").  It concluded that Jade had not satisfied either the unlawful-inducement prong or the reprehensible-conduct prong.

8

Regarding unlawful inducement, the trial court considered the factors set forth in our caselaw and paid special attention to escalation and targeting. The trial court acknowledged that officers introduced a minor into the conversation despite Jade's initially intending to speak with an adult. But the trial court reasoned that Jade "eventually arranged to meet the officer even though she had represented she was a minor." The trial court recognized that Jade set out to commit a misdemeanor—soliciting—and was ultimately charged with engaging in child sexually abusive activity, which is a "serious felony." The trial court did not consider the distinct punishments for these crimes, including sentence length and obligations under Michigan's Sex Offenders Registration Act, MCL 28.721 *et seq*. With regard to targeting, the trial court further noted that "[c]aselaw approving the use of reverse sting operations suggests" that there was no impermissible targeting in this case. The trial court therefore concluded that the police did not engage in conduct that would impermissibly induce a similarly situated, law-abiding person to commit the charged crimes.

Regarding reprehensible conduct, the trial court rejected Jade's argument that the police had acted so egregiously that entrapment should apply regardless of inducement. The trial court reasoned that Michigan courts have approved reverse sting operations and tactics that merely provide an opportunity to commit a crime. Both conclusions rested on the trial court's findings that the police merely provided the opportunity for Jade to commit criminal acts and that he willingly seized that opportunity. For these reasons, the trial court denied Jade's motion to dismiss on the ground of entrapment.

Jade next filed an interlocutory appeal before the Court of Appeals, requesting leave to appeal the trial court's denial of his entrapment claim or any relief the Court deemed

appropriate. While his appeal was pending, Jade reached a plea agreement in the trial court. He pleaded guilty to accosting a child for immoral purposes, and the prosecution agreed to dismiss the remaining count of child sexually abusive activity and the two corresponding counts of using a computer to commit a crime.[3]

The Court of Appeals granted the application for leave to appeal and affirmed the trial court's decision. See *People v Jade*, vacated opinion of the Court of Appeals, issued October 28, 2024 (Docket No. 365951), p 12. Jade then applied for leave to appeal before this Court, which we granted. We directed oral argument as to whether the Court of Appeals erred by

> (1) concluding that the standard of review for entrapment rulings requires consideration of whether the ultimate determination of entrapment is clearly erroneous as provided in *People v Johnson*, 466 Mich 491, 497 (2002), as opposed to a standard involving a conclusion or legal determination that is reviewed de novo, see *People v Fyda*, 288 Mich App 446, 456[; 793 NW2d 712] (2010); (2) relying on and applying the legal standard that police do not engage in entrapment by merely presenting a defendant with an opportunity to commit the crime with which he was charged without considering the defendant's readiness and willingness to commit the charged crime, as stated in *People v Jamieson*, 436 Mich 61, 68 (1990); and (3) affirming the trial court's determination that the defendant was not entrapped, see *Johnson*, 466 Mich at 498. [*People v Jade*, ___ Mich ___, ___; 20 NW3d 867, 867 (2025).]

---

[3] A claim of entrapment is not waived by an unconditional guilty plea, see *People v White*, 411 Mich 366, 386-387; 308 NW2d 128 (1981), provided that a defendant preserves the claim by raising it before the trial court, see *People v Crall*, 444 Mich 463, 464; 510 NW2d 182 (1993). Because Jade preserved his claim, his guilty plea does not impair appellate review of the trial court's entrapment decision.

10

## II. LAW AND ANALYSIS

### A. STANDARD OF REVIEW

We first consider the appropriate standards of review for an entrapment decision. The Court of Appeals concluded that, under this Court's precedent, the standards of review for entrapment decisions are organized into three tiers: the trial court's factual findings are reviewed for clear error, questions of law are reviewed de novo, and the trial court's ultimate ruling on whether entrapment occurred is reviewed for clear error. *Jade*, vacated op at 5-6.

Our courts, however, have applied inconsistent standards of review to entrapment claims. Compare *Johnson*, 466 Mich at 497 ("A trial court's finding of entrapment is reviewed for clear error."), with *Fyda*, 288 Mich App at 456 ("Whether entrapment occurred is determined by considering the facts of each case and is a question of law for this Court to decide de novo."). This case provides an opportunity for this Court to clarify the appropriate standards of review.

When ruling on entrapment claims, trial courts make factual findings and legal conclusions. Each has a different standard of review. We regularly apply distinct standards of review to different components of a single issue, one governing factual findings and another governing legal conclusions. See, e.g., *People v Williams*, 472 Mich 308, 313; 696 NW2d 636 (2005) (regarding suppression hearings, we review the trial court's factual findings for clear error, and the trial court's holding that a Fourth Amendment violation did or did not occur is a legal determination that we review de novo); *People v Daoud*, 462

11

Mich 621, 629-630; 614 NW2d 152 (2000) (regarding a defendant's waiver of *Miranda*[4] rights, factual findings are reviewed for clear error, and "the meaning of 'knowing and intelligent' is a question of law" reviewed de novo); *People v Armstrong*, 490 Mich 281, 289; 806 NW2d 676 (2011) (regarding claims of ineffective assistance of counsel, while the specific facts regarding counsel's performance are reviewed for clear error, whether those facts establish a violation of the Sixth Amendment right to effective assistance of counsel is a question of law reviewed de novo); *People v Knight*, 473 Mich 324, 345; 701 NW2d 715 (2005) (regarding *Batson*[5] challenges, the specific facts regarding a prosecutor's stated reasons for peremptory strikes are reviewed for clear error, and whether those facts establish purposeful discrimination is a question of law reviewed de novo).

Despite the clarity of these examples in other areas of law, the development of standards of review has been unclear in the entrapment context. The initial confusion can be traced back to *D'Angelo*, 401 Mich 167, in which we stated:

> In deciding the entrapment question the trial court should make specific findings of fact. Should the trial court find the claim of entrapment to be proved, the related charge will be dismissed. If the court finds the claimed entrapment not proved, the prosecution will proceed.
>
> *The trial court's finding will be subject to appellate review under the clearly erroneous standard.* [*Id*. at 183 (emphasis added).]

Citing *D'Angelo*, Justice BRICKLEY explained in *Jamieson* that a "trial judge's findings on the issue [of entrapment] are subject to appellate review under the clearly erroneous standard." *Jamieson*, 436 Mich at 80 (opinion by BRICKLEY, J.). Most recently, in

---

[4] *Miranda v Arizona*, 384 US 436; 86 S Ct 1602; 16 L Ed 2d 694 (1966).

[5] *Batson v Kentucky*, 476 US 79; 106 S Ct 1712; 90 L Ed 2d 69 (1986).

12

*Johnson*, we cited *Jamieson* for the proposition that "[a] trial court's finding of entrapment is reviewed for clear error." *Johnson*, 466 Mich at 497, citing *Jamieson*, 436 Mich at 80 (opinion by BRICKLEY, J.).

Tracing these precedents back to the original language in *D'Angelo*, it appears that this Court provided a standard of review for findings of fact but did not clearly address whether there is a separate standard for legal determinations. See *D'Angelo*, 401 Mich at 183. However, in several of our opinions, both before and after *D'Angelo*, we have explicitly referred to the ultimate determination of entrapment as a matter of law, suggesting that a de novo standard applies. See, e.g., *Jamieson*, 436 Mich at 65 (opinion by BRICKLEY, J.) ("On the basis of the objective test, we would reverse the decisions of the lower courts in this case and hold, as a matter of law, that defendants were not entrapped."); *People v White*, 411 Mich 366, 390; 308 NW2d 128 (1981) ("We hold that the defendant was entrapped as a matter of law."); *People v Auer*, 393 Mich 667, 678; 227 NW2d 528 (1975) ("There was no entrapment as a matter of law . . . ."); *Turner*, 390 Mich at 22 ("In this case, we hold that defendant was entrapped as a matter of law."); *People v Sinclair*, 387 Mich 91, 122; 194 NW2d 878 (1972) (opinion by SWAINSON, J.) (describing a trial court that "ruled as a matter of law that a defendant was entrapped"). Indeed, our Court of Appeals has even cited *D'Angelo* for the proposition that entrapment is a question of law. See, e.g., *People v Patrick*, 178 Mich App 152, 154; 443 NW2d 499 (1989) ("Whether entrapment has occurred is a question of law for the trial court to decide."), citing *D'Angelo*, 401 Mich at 177. Despite our recognition that entrapment is a matter of law, we have stated, without reasoning, that entrapment determinations are to be reviewed for clear error. See, e.g., *Juillet*, 439 Mich at 61 (opinion by BRICKLEY, J.) ("In its decision,

13

the trial court must make specific findings of fact on the entrapment issue, and its decision will be reviewed under the clearly erroneous standard."); *Johnson*, 466 Mich at 497 ("A trial court's finding of entrapment is reviewed for clear error.").

There is, therefore, a discrepancy in the caselaw between this Court's longstanding acknowledgment that entrapment is a matter of law and our prior recognition of a clear-error standard for entrapment decisions that failed to distinguish between factual and legal determinations. Compare *Sinclair*, 387 Mich at 122, with *D'Angelo*, 401 Mich at 183. This is not the first occasion on which standards of review for different aspects of a single issue have needed to be clarified. For example, in *Knight*, we clarified that *Batson* claims involve both factual findings and legal holdings, and the applicable standard of review depends on which step of the *Batson* analysis is at issue. *Knight*, 473 Mich at 338. See also *Sherman v Progressive Mich Ins Co*, ___ Mich ___, ___; ___ NW3d ___ (Docket No. 167826) (April 20, 2026); slip op at 7-10 (clarifying the standards of review applicable to different aspects of a trial court's equitable-rescission analysis). In a similar vein, it is necessary to clarify the standards of review for entrapment.

We hold that a trial court's factual findings following an entrapment hearing are reviewed for clear error, while its ultimate legal determination regarding whether entrapment occurred is reviewed de novo. Compare *Johnson*, 466 Mich at 497, with *Fyda*, 288 Mich App at 456. To the extent that our prior opinions suggest otherwise, we clarify here that only factual findings in an entrapment context are reviewed for clear error. "Clear error exists when the reviewing court is left with the definite and firm conviction that a mistake has been made." *People v Kurylczyk*, 443 Mich 289, 303; 505 NW2d 528 (1993) (opinion by GRIFFIN, J.). But the ultimate legal determination as to whether entrapment

14

occurred and any other legal determinations are reviewed de novo.[6] That is to say, a reviewing court must examine these determinations "independently, without any required deference" to the decisions of the lower tribunal. See *People v Bruner*, 501 Mich 220, 226; 912 NW2d 514 (2018). Accordingly, we vacate the Court of Appeals' application of clear-error review to the ultimate entrapment determination.

When resolving entrapment claims, trial courts should, to the extent possible, avoid blending factual findings with legal conclusions in their opinions and orders. Instead, they should present each separately in their decisions, as is expected in bench trials, to permit effective appellate review. See MCR 6.403 (requiring that, when trial by jury has been waived, a trial court "must find the facts specially" and "state separately its conclusions of law").

### B. THE LEGAL FRAMEWORK FOR ENTRAPMENT CLAIMS

We now turn to the issue of entrapment. Entrapment is a common-law defense that centers on the principle that "the function of law enforcement is to deter crime and not to manufacture it." *Jamieson*, 436 Mich at 74. The defense "focuses exclusively upon the nature of the police conduct . . . ." *D'Angelo*, 401 Mich at 182. To raise an entrapment defense, the accused must "present facts collateral or incidental to the

---

[6] As Judge MURRAY aptly noted below, a rule to the contrary would mean that "the trial court's legal determination would essentially be binding on the appellate courts because of the more deferential standard of review, creating an anomaly by allowing trial courts to determine the scope of the common law in this state." *Jade* (MURRAY, J., concurring), vacated op at 3. He grounded this concern in *Henry v Dow Chem Co*, 473 Mich 63, 83; 701 NW2d 684 (2005), which makes clear that this Court is "the principal steward of Michigan's common law." *Id*. See also *D'Angelo*, 401 Mich at 175 (envisioning the creation of "a body of [entrapment] precedent which will stand as a point of reference both for law enforcement officials and the courts").

[charged] criminal act which justify acquittal" under our entrapment jurisprudence. *D'Angelo*, 401 Mich at 179.

### 1. THE DEVELOPMENT OF THE ENTRAPMENT DEFENSE

Entrapment is an old defense. We first recognized some version of entrapment in the late nineteenth century. As early as *Saunders v People*, 38 Mich 218, 223 (1878) (CAMPBELL, C.J., concurring), Chief Justice CAMPBELL condemned "the encouragement of criminals to induce them to commit crimes in order to get up a prosecution against them" as "scandalous and reprehensible." We reaffirmed that principle in *Regents of the Univ of Mich v Rose*, 45 Mich 284, 308; 7 NW 875 (1881), noting that this Court has "gone as far as any court has in denouncing attempts to encourage men to commit crime in order to detect and punish them . . . ." Later, in *People v McCord*, 76 Mich 200, 205; 42 NW 1106 (1889), we set aside a conviction obtained through "one of the most disgraceful instances of criminal contrivance to induce a man to commit a crime . . . ." We then refined the doctrine of entrapment in *People v Smith*, 296 Mich 176, 182; 295 NW 605 (1941), holding that only "active measures" of persuasion may render a crime the product of entrapment. (Quotation marks and citation omitted.) See also *People v Mitchell*, 298 Mich 172, 183-185; 298 NW 495 (1941) (finding no error in the entrapment instruction provided by the trial court, which stated that it was "against public policy for officers of the law to induce the commission of criminal offenses" and if the jury found "that the officer induced these defendants," they should be found not guilty).

In a series of cases in the 1970s, this Court began developing the entrapment defense into its modern form. See *Sinclair*, 387 Mich 91; *Turner*, 390 Mich 7; *Auer*, 393 Mich

16

667; and *D'Angelo*, 401 Mich 167. Mirroring debate across the country and in the United States Supreme Court, these cases include discussion about the pros and cons of objective entrapment tests that focus on police behavior and subjective entrapment tests that account for the susceptibility of individual defendants to be influenced by police enticement (otherwise known as predisposition). See, e.g., *Russell*, 411 US at 441-442, 445 n 3 (Stewart, J., dissenting) (arguing against the subjective approach employed by the majority, collecting federal opinions adopting an objective approach, and noting that an "objective approach is the one favored by a majority of . . . commentators"). From the Michigan cases emerged the doctrine at the center of this dispute, and a careful review of each seminal case will illuminate the issues before this Court.

In the first of these cases, *Sinclair*, we established an exclusionary rule for evidence obtained via entrapment. *Sinclair*, 387 Mich at 122 (opinion by SWAINSON, J.). We noted the "practical problems" that arise with the use of a subjective test that considers both "the conduct of the police" and "the predisposition of the defendant" to commit the charged offense. *Id*. at 118-119. A year later, in *Turner*, we adopted an objective test for entrapment in Michigan by incorporating the logic of Justice Stewart's dissenting opinion in *Russell*. *Turner*, 390 Mich at 22. Under this test, the purpose of the entrapment defense is not " 'to protect persons who are "otherwise innocent" ' " from government inducement, as a subjective test would; rather, the purpose is " 'to prohibit unlawful governmental activity in instigating crime,' " thereby demarcating permissible and impermissible law enforcement conduct. *Turner*, 390 Mich at 20, quoting *Russell*, 411 US at 442 (Stewart, J., dissenting). Put differently, the entrapment inquiry asks whether the government is prosecuting a crime that it stopped or a crime that it created. We stated that the focus of

17

this analysis is whether "actions of the police were . . . reprehensible under the circumstances . . . ." *Turner*, 390 Mich at 22.

To best serve its purpose, then, entrapment jurisprudence must focus on law enforcement's conduct rather than a defendant's innocence or predisposition. As we explained in *Turner*, " 'focusing on the defendant's innocence or predisposition has the direct effect of making what is permissible or impermissible police conduct depend upon the past record and propensities of the particular defendant involved.' " *Id*. at 21, quoting *Russell*, 411 US at 443 (Stewart, J., dissenting). But " '[p]ermissible police activity does not vary according to the particular defendant concerned[.]' " *Russell*, 411 US at 444, quoting *Sherman v United States*, 356 US 369, 383; 78 S Ct 819; 2 L Ed 2d 848 (1958) (Frankfurter, J., concurring in the result). The boundaries of lawful police conduct should be defined by uniform, objective standards designed to prevent abuse—not by the characteristics of any particular defendant. As we explained when adopting the objective test in *Turner*, this premise is the reason the test does not turn on any particular defendant's predisposition to commit the charged crime. See *Turner*, 390 Mich at 22.

In *Turner*, we explained that Justice Stewart's dissent in *Russell* effectively formulates the objective test, and we reproduced portions of that dissent, incorporating it into our state's law. *Id*. at 19-21. In particular, we quoted Justice Stewart's formulation that entrapment occurs " 'when the agents' involvement in criminal activities goes beyond the mere offering of such an opportunity, *and* when their conduct is of a kind that could induce or instigate the commission of a crime by one not ready and willing to commit it . . . [,] regardless of the character or propensities of the particular person induced[.]' "

18

*Turner*, 390 Mich at 21, quoting *Russell*, 411 US at 445 (Stewart, J., dissenting) (emphasis added).[7]

Two years after *Turner*, we held in *Auer* that the objective test for entrapment that this Court announced in *Turner* would apply prospectively rather than retroactively. *Auer*, 393 Mich at 677. Two years after that, we issued *D'Angelo*, which established a procedural framework for raising and litigating entrapment claims. Specifically, *D'Angelo* created the requirement of a separate evidentiary hearing for entrapment claims, modeled on a *Walker*[8] hearing, at which the trial judge—not the jury—decides the entrapment issue based on evidence presented outside of the jury's presence. *D'Angelo*, 401 Mich at 177-178. We also held that the defendant bears the burden of proving entrapment by a preponderance of the evidence because the claim "places the defendant in an accusatorial posture upon an issue which . . . is irrelevant to his guilt or innocence." *Id*. at 180, 183. Further, the defendant need not admit the charged crime to assert the defense, and any testimony at the entrapment hearing is inadmissible in the case-in-chief for any purpose except impeachment. *Id*. at 178. In sum, *D'Angelo* supplied the procedural architecture that continues to govern entrapment claims in Michigan. See *id*. at 177-178, 180.

Taken together, these decisions set the stage for Michigan's modern-day entrapment jurisprudence. In the 1970s, we adopted the objective test in *Turner*, we clarified in *Auer*

---

[7] As Chief Justice MICHAEL F. CAVANAGH later recognized, the inquiry is not "whether the defendant at bar was 'ready and willing to commit the crime,'" but whether an "average, hypothetical person" who is assumed *not* to be " 'ready and willing' " to commit the crime would have been induced to do so by the governmental activity. *Juillet*, 439 Mich at 73-74 (opinion by M. F. CAVANAGH, C.J.) (emphasis omitted).

[8] *People v Walker (On Rehearing)*, 374 Mich 331; 132 NW2d 87 (1965).

that the test would apply prospectively, and in *D'Angelo*, we established a comprehensive procedural framework for raising and litigating entrapment claims. These cases collectively defined both the substance of the entrapment defense, which focuses on unlawful government conduct rather than a defendant's predisposition to commit the charged offense, and the procedure for adjudicating entrapment defenses.

## 2. MICHIGAN'S MODIFIED OBJECTIVE TEST FOR ENTRAPMENT

Following the foundational decisions of the 1970s, we made significant changes to our entrapment doctrine in *Juillet*. That split decision[9] ultimately resulted in the modified objective test we apply today. *Johnson*, 466 Mich at 508. This test emerged as our Court continued to debate the pros and cons of an objective versus subjective test. See, e.g., *Jamieson*, 436 Mich at 67, 78-80 (opinion by BRICKLEY, J.) (reexamining "the viability of the objective test" and finding, as a matter of stare decisis, that it had not been "so undermined by time or circumstances that it should be discarded"); *Johnson*, 466 Mich at 508-509 (noting that the Court had granted leave to consider whether the modified objective approach was the most appropriate test, but that it had not reached that question because the defendant's claim failed even under this "more lenient" test). A modified approach, which recognizes that even under an objective test, "the state of mind of the accused" is a "factor" for courts to consider, *Jamieson*, 436 Mich at 74 (opinion by

[9] No opinion in *Juillet* commanded a majority of the Court. Justice BRICKLEY and Chief Justice CAVANAGH wrote the two plurality opinions, each of which was joined by two other justices. Justices RILEY and GRIFFIN joined Justice BRICKLEY's opinion, while Justices LEVIN and MALLETT joined Chief Justice CAVANAGH's opinion. Justices BOYLE and GRIFFIN both wrote partial concurrences agreeing and disagreeing with various aspects of each of the other opinions.

20

BRICKLEY, J.), was debated in the separate opinions in *Jamieson* and *Juillet*, none of which garnered a majority. The modified approach was ultimately adopted by a majority in *Johnson*. See *Johnson*, 466 Mich at 508-509 (stating that the current entrapment test in Michigan was the modified objective test).

The two plurality opinions in *Juillet* took opposing positions on how to define a defendant's lack of "readiness and willingness" to commit the charged crime, though both agreed that the inquiry is not subjective. In the lead opinion, Justice BRICKLEY concluded that the entrapment analysis may include consideration of the defendant's own circumstances. See *Juillet*, 439 Mich at 55 (opinion by BRICKLEY, J.) ("[T]he court can review the circumstances of the defendant to determine whether the police conduct would induce a similarly situated person, with an otherwise law-abiding disposition, to commit the charged crime. The circumstances of the particular defendant may be considered by the trial court in analyzing the ready and willing component of the objective entrapment test."). In the second plurality opinion, Chief Justice MICHAEL F. CAVANAGH disagreed, cautioning that considering a defendant's individual circumstances risks adopting a subjective test's predisposition analysis. See *id*. at 74-75 (opinion by M. F. CAVANAGH, C.J.). He maintained that the "ready and willing" assessment must focus not on criminality in the abstract but on the particular criminal activity—or level of activity—alleged. *Id*. at 74, 76 ("[T]he court [is required to] focus more narrowly on the specific criminal activity or level of activity for which the defendant is charged, and ask whether the police conduct posed an objective risk of causing a hypothetical person who had not yet reached that level of criminal activity (even if he was not a spotlessly law-abiding person) to do so.").

21

Chief Justice CAVANAGH also proposed that Michigan's objective entrapment framework has two distinct prongs. He described the unlawful-inducement inquiry outlined above as the "causation prong," focused on whether police conduct would induce an average person who was not ready and willing to commit the offense. *Id*. at 72-73. He further explained that there is a separate "reprehensible conduct" prong that centers on "intolerable conduct" by law enforcement agents, in which the agents "become the instigators of the crime, or partners in its commission, or the creative brain behind the illegal scheme." *Id*. at 76-78, citing *Russell*, 411 US at 439 (quotation marks omitted). When the second prong is met, entrapment can occur "even though [it] may not be established under a strictly causation-oriented approach . . . ." *Juillet*, 439 Mich at 78 (opinion by M. F. CAVANAGH, C.J.).

In *People v Fabiano*, 192 Mich App 523; 482 NW2d 467 (1992), the Court of Appeals synthesized a unified rule from the competing opinions in *Juillet*. It concluded that "*Juillet* establishe[d] a two-pronged objective test for entrapment, with entrapment existing if *either* prong is met." *Id*. at 531. Under that formulation, a defendant can establish entrapment by showing that either "(1) the police engaged in impermissible conduct that would have induced a person similarly situated as the defendant, though otherwise law-abiding, to commit the crime, *or* (2) the police engaged in conduct so reprehensible that it cannot be tolerated by the Court." *Id*. at 526.

Addressing the inducement prong, the Court of Appeals determined that Justice BRICKLEY's understanding of the standard commanded a majority of the Court and represented the controlling view. *Id*. at 527-528. That approach requires asking "whether the police conduct would have induced a person similarly situated as the defendant to

commit the crime rather than whether it would have induced an average, law-abiding citizen to commit the offense." *Id*. at 526. As to the reprehensible-conduct prong, the Court of Appeals reasoned that the nature of the police conduct informs inquiries under both prongs, but emphasized that the conduct must be "more reprehensible" under the reprehensible-conduct prong than the unlawful-inducement prong to preserve the distinct role of the inducement analysis. *Id*. at 531.

In our next entrapment decision, *Johnson*, 466 Mich 491, we adopted the two-prong framework that came from the separate opinions in *Juillet*. See *id*. at 498 ("Under the current entrapment test in Michigan, a defendant is considered entrapped if either (1) the police engaged in impermissible conduct that would induce a law-abiding person to commit a crime in similar circumstances or (2) the police engaged in conduct so reprehensible that it cannot be tolerated."), citing *Juillet*, 439 Mich 34.[10] This test preserves the core principle announced in *Turner*—that the doctrine focuses on unlawful government conduct rather than a defendant's predisposition to commit the charged offense—while incorporating additional safeguards and clarifications. The result is a two-prong standard that both defines the substance of the entrapment defense and provides the framework for its application.

a. THE UNLAWFUL-INDUCEMENT PRONG

Under the first prong of the modified objective test (the unlawful-inducement prong), entrapment occurs when the police engage in "conduct that would induce a law-

---

[10] As previously noted in this opinion, this two-prong framework was synthesized in *Fabiano*, 192 Mich App at 526, 531.

abiding person to commit a crime in similar circumstances." *Johnson*, 466 Mich at 507.

Unlawful inducement may be assessed by considering the following nonexhaustive factors

we have previously identified:

> (1) whether there existed appeals to the defendant's sympathy as a friend, (2) whether the defendant had been known to commit the crime with which he was charged, (3) whether there were any long time lapses between the investigation and the arrest, (4) whether there existed any inducements that would make the commission of a crime unusually attractive to a hypothetical law-abiding citizen, (5) whether there were offers of excessive consideration or other enticement, (6) whether there was a guarantee that the acts alleged as crimes were not illegal, (7) whether, and to what extent, any government pressure existed, (8) whether there existed sexual favors, (9) whether there were any threats of arrest, (10) whether there existed any government procedures that tended to escalate the criminal culpability of the defendant, (11) whether there was police control over any informant, and (12) whether the investigation was targeted. [*Johnson*, 466 Mich at 498-499, citing *Juillet*, 439 Mich at 56-57 (opinion by BRICKLEY, J.).]

But these factors are not mere boxes to be checked. Rather, trial courts must ask

whether the police conduct at issue went beyond merely offering an opportunity to commit

the charged offense and whether that police conduct could have induced a hypothetical

law-abiding person to commit an offense they were not otherwise ready and willing to

commit. *Turner*, 390 Mich at 21; *Jamieson*, 436 Mich at 80 (opinion by BRICKLEY, J.).

These factors assist in this analysis by serving as "red flags" for inducement. While their

presence or absence in any given case may not be dispositive, factual similarities to

previously established instances of entrapment can be a significant factor in the trial court's

analysis. Cf. *D'Angelo*, 401 Mich at 175 (contemplating the creation of "a body of

[entrapment] precedent which will stand as a point of reference both for law enforcement

officials and the courts").

24

We clarify that, under the unlawful-inducement prong of the test, a court must consider a defendant's readiness and willingness to commit the charged crime. But readiness and willingness and "mere opportunity" are not separate elements that must be established independently of each other. We clarify that the phrase "ready and willing" functions as a conceptual expression of the objective-causation inquiry, serving as a way to identify whether the cause of the offense came from law enforcement rather than the defendant. It does not add any additional element to the inducement prong.

We have previously explained that the unlawful-inducement inquiry is objective, not subjective, focusing on a hypothetical person. *Jamieson*, 436 Mich at 80 (opinion by BRICKLEY, J.) ("The facts of each case must be examined to determine whether, under the circumstances, the governmental activity would induce a hypothetical person not ready and willing to commit the crime to engage in criminal activity."). At the same time, a court may consider a particular defendant's circumstances, but only to assist in evaluating whether the police conduct at issue would have led an ordinary, law-abiding person in similar circumstances to commit the charged crime. *Juillet*, 439 Mich at 55 (opinion by BRICKLEY, J.) ("The circumstances of the particular defendant may be considered by the trial court in analyzing the ready and willing component of the objective entrapment test, as we stated in *Jamieson*.").

We have used different phrases to describe the focus of the unlawful-inducement inquiry, including references to a hypothetical person "not ready and willing" to commit the offense and to a "normally law-abiding person." *Id*. at 54. Whether phrased as a hypothetical person "not ready and willing" to commit the offense or as a "normally law-abiding person," the substance of the inquiry is the same: both formulations describe

25

a neutral benchmark intended to isolate the causal role of police conduct and prevent the analysis from collapsing into a subjective assessment of the defendant's personal propensity. See *id*. ("By applying the term 'normally law-abiding person,' we were simply restating who could be considered a 'person not ready and willing to commit' the crime with which he is charged."). These alternative terms are not separate tests but parallel ways of ensuring that the unlawful-inducement prong remains focused on whether government conduct, rather than the defendant's propensity, supplied the causal impetus for the offense. Properly understood, the objective test is preserved not by the choice of terminology, but by maintaining the distinction between the government's inducement and the defendant's propensity as two analytically distinct potential causes of the crime, of which only the former is relevant to an entrapment inquiry.

## b. THE REPREHENSIBLE-CONDUCT PRONG

Under the second prong (the reprehensible-conduct prong), entrapment occurs when "the police engage[] in conduct so reprehensible that it cannot be tolerated." *Johnson*, 466 Mich at 498. This is consistent with our original articulation of the entrapment standard in *Turner*. See *Turner*, 390 Mich at 22 (stating that the "real concern" in entrapment cases is "whether the actions of the police were so reprehensible under the circumstances that the Court should refuse . . . to permit a conviction to stand") (comma omitted). The Court of Appeals astutely remarked in *Fabiano* that, for the distinction between the two prongs to be meaningful, "the nature of the conduct requirement [must] differ[]" for each prong. *Fabiano*, 192 Mich App at 531. We agree with its conclusion that "police conduct must be more reprehensible under [the reprehensible-conduct] prong than under the [unlawful-

26

inducement] prong." *Id.* The *Fabiano* panel described reprehensible conduct as "certain conduct by government that a civilized society simply will not tolerate[.]" *Id.* at 532.

But along with the requirement that conduct be more reprehensible under this prong, there must be other substantive differences between the two, lest the reprehensible-conduct prong simply become a harder-to-satisfy version of the inducement prong. We agree with the *Fabiano* panel and Chief Justice MICHAEL F. CAVANAGH that another key difference relates to causation. While the inducement prong is effectively an objective-causation test, the reprehensible-conduct prong may be met "without regard to causation," so long as the conduct in question is egregious enough to be intolerable by a civilized society. *Fabiano*, 192 Mich App at 532; see also *Juillet*, 439 Mich at 77-78 (opinion by M. F. CAVANAGH, C.J.) (noting that "there may well be cases in which, even though entrapment may not be established under a strictly causation-oriented approach, I might still conclude that illegal entrapment has occurred" if law enforcement commits "certain criminal, dangerous, or immoral acts"). In short, the reprehensible-conduct prong requires "an inquiry into '[t]he crucial question [of] . . . whether the police conduct revealed in the particular case falls below standards . . . for the proper use of governmental power.' " *Jamieson*, 436 Mich at 105-106 (ARCHER, J., dissenting) (first brackets in *Jamieson*), quoting *Sherman*, 356 US at 382 (Frankfurter, J., concurring).

### 3. ESCALATION

Both prongs of the test are brought to bear in determining whether the challenged police conduct constitutes entrapment. But the entrapment analysis under each prong is distinct. Consider escalatory conduct. Under the first prong, escalation constitutes

27

entrapment if it would induce a law-abiding person in similar circumstances to commit the offense. See *Johnson*, 466 Mich at 507-508; *Turner*, 390 Mich at 21; *Jamieson*, 436 Mich at 80 (opinion by BRICKLEY, J.). Under the second prong, we clarify that escalation constitutes entrapment if it " 'falls below standards, to which common feelings respond, for the proper use of governmental power.' " *Jamieson*, 436 Mich at 106 (ARCHER, J., dissenting), quoting *Sherman*, 356 US at 382 (Frankfurter, J., concurring).

Our courts have emphasized that escalation from a less serious offense to a more serious offense may itself establish entrapment. In *People v Killian*, 117 Mich App 220, 223; 323 NW2d 660 (1982), the Court of Appeals correctly noted that "[t]he most troubling aspect of the activities of the police in this case is the escalation of defendant's criminal culpability," and it held that entrapment occurred "[i]n part" because "the sale of large quantities of cocaine is an offense of a different order than the use of cocaine or the sale of marijuana." The Court of Appeals in this case misapplied *Killian* by treating it as limited to circumstances in which the police target a defendant about whom they had prior information. *Jade*, vacated op at 10. But *Killian* did not turn on subjective targeting or prior knowledge; it turned on escalation. Its core principle applies whenever police conduct transforms a suspect's apparent willingness to commit a less serious offense into exposure for a more serious, different-order offense.

We have recognized that, unlike the impermissible escalation present in *Killian*, there is no escalation constituting entrapment when police simply give a suspect another opportunity to commit the same offense that the suspect previously committed, as established earlier in the investigation. *Johnson*, 466 Mich at 503 (holding that there is no impermissible escalation when "the government simply provide[s] defendant with an

28

additional opportunity to commit a crime that [defendant] had previously committed"). Nor do police impermissibly escalate a suspect's criminal conduct when they delay arrest where the effectiveness of a legitimate, ongoing undercover investigation depends on the delay, such as when an earlier arrest would impair efforts to determine a suspect's capabilities or identify suppliers. See *People v Ealy*, 222 Mich App 508, 511; 564 NW2d 168 (1997) (holding that delay was justified because "an earlier arrest would have impaired the ability of the police to conduct an ongoing undercover narcotics investigation").

The throughline of the entrapment doctrine is that police must detect crime, not manufacture it. Under the unlawful-inducement prong, entrapment occurs when police conduct is of a kind that would cause criminal behavior by prodding a hypothetical law-abiding person into offending. Under the reprehensible-conduct prong, entrapment occurs when the government's conduct is so offensive that it cannot be tolerated without regard to causation, such as law enforcement running the entirety of a criminal operation.

## C. WHETHER JADE WAS ENTRAPPED

The final issue on appeal is whether Jade was entrapped under the circumstances of this case. We remand for the trial court to consider, in the first instance, the escalatory nature of the police conduct here, including the increase in offense and punishment between the crime Jade was ready and willing to commit and the crimes he was ultimately charged with, under the legal standard that we clarify today.

To be clear, we have clarified the proper legal framework for assessing entrapment claims under Michigan law. These clarifications preserve the core principles of entrapment doctrine. But these clarifications do not call into question all sting operations. As we

29

explained in *Butler*, police officers in undercover operations may respond to criminal intent without manufacturing crime. *People v Butler*, 444 Mich 965, 965-966 (1994). Police lawfully respond to criminal intent when they react to a suspect's contemplation or initiation of unlawful conduct and simply allow the suspect to follow through on the crime the suspect has already chosen to pursue. For example, police may answer inquiries or arrange meetings so long as officers do not create a new crime or increase the severity of the suspect's contemplated offense. This stands in contrast to manufacturing crime, which occurs when law enforcement introduces new criminal elements, escalates conduct into new crimes, or induces conduct that the suspect had not shown a willingness to commit.

This case presents a narrower question. After Jade stated that his interlocutor must be at least 16 years old, he had provided grounds to satisfy the elements of a lesser crime, such as a violation of MCL 750.449a(2), which prohibits paying "to engage the services of another person, who is less than 18 years of age . . . , for the purpose of prostitution, lewdness, or assignation . . . ." The decoy could have stopped the conversation here, shifted to the next phase of the sting operation, and potentially pursued charges under MCL 750.449a. At that point, police officers may have already had a sufficient basis to pursue a charge but continued until more charges (perhaps the charges they initially had in mind) could be filed, which raises concerns under the clarified framework. Whether the officers continued the exchange in a manner that impermissibly escalated Jade's conduct is an issue that the trial court has not yet addressed under this opinion's clarified standard. Today's opinion clarifies that, where the record reflects a defendant's willingness to commit a lesser offense not charged, the entrapment inquiry must focus on whether law enforcement escalated a defendant's conduct from that constituting a less serious offense to conduct

30

constituting a more serious offense or additional criminal offenses. Earlier cases, including *Killian*, 117 Mich App at 223, recognized that such escalation may constitute entrapment.

Here, the trial court recognized that escalation was a possible form of entrapment but also stated that "[t]he texts reveal that police did nothing more than provide defendant the opportunity to commit a crime, even if it wasn't the one he initially intended to commit upon responding to the ad." The distinction between the crime a suspect intends to commit at the outset of an operation and the crime ultimately charged is significant for the escalation analysis when the charged offense is more serious. Because the trial court did not consider the full impact of escalating to a more serious offense, and the trial court now has the benefit of a newly clarified legal standard provided here, remand is required. Under the clarified entrapment framework, the question in this case is whether law enforcement unlawfully escalated the charges—not whether Jade was willing to commit a lesser, uncharged offense. Law enforcement can conduct undercover operations without entrapping suspects. Nevertheless, for criminal charges to withstand an entrapment defense, law enforcement operations must not involve conduct that contravenes this state's entrapment law, as clarified in this opinion.

On remand, the trial court should apply the clarified entrapment framework articulated in this opinion and determine whether impermissible escalation occurred. In doing so, the trial court may make additional factual findings. Accordingly, we vacate the Court of Appeals' decision affirming the trial court's order denying Jade's motion to dismiss the charges on the basis of entrapment, and we remand to the trial court.[11]

---

[11] This appears to be our primary point of disagreement with the partial dissent. The partial dissent would apply the clarified entrapment framework to the trial court's existing findings, resolve the inducement prong now, and limit the scope of remand to determining

31

## III.  CONCLUSION

We hold that the proper standards of review for entrapment rulings mirror the ordinary division between factual and legal determinations: a trial court's factual findings are reviewed for clear error, while its ultimate legal conclusion as to whether entrapment occurred and its resolution of any underlying legal questions are reviewed de novo.  We further reaffirm that Michigan applies a two-prong, modified objective test for entrapment, and we clarify the proper role of readiness and willingness within the unlawful-inducement prong as well as the scope of the reprehensible-conduct prong.  We also clarify that the phrase "ready and willing" does not create a new element of the entrapment test but simply expresses the objective-causation inquiry used to distinguish police inducement from a defendant's independent agency and propensity.  In light of the clarification of Michigan's entrapment doctrine that we make today, we vacate the Court of Appeals' opinion, and we remand to the trial court for further proceedings consistent with this opinion.

Noah P. Hood
Megan K. Cavanagh
Richard H. Bernstein
Elizabeth M. Welch
Kyra H. Bolden
Kimberly A. Thomas

---

whether any police conduct resulted in impermissible escalation under the reprehensible-conduct prong.  We instead remand for the trial court to apply the clarified standard to both prongs in the first instance, with an unfiltered view of the material facts.

PEOPLE OF THE STATE OF MICHIGAN,

  Plaintiff-Appellee,

v              No. 167920

JAYNEEL RAVINDRA JADE,

  Defendant-Appellant.

---

WELCH, J. (*concurring*).

I concur fully with the majority opinion. I write separately to expand on its discussion of two aspects of the entrapment test. First, I write to explain why I believe the reprehensible-conduct prong of the entrapment test could potentially apply to police operations similar to the one here. And second, I describe what in my view does—and does not—constitute impermissible escalation.

## I. REPREHENSIBLE CONDUCT

The entrapment doctrine exists to "discourage [police misconduct] and uphold 'public confidence in the fair and honorable administration of justice[.]' " *People v Sinclair*, 387 Mich 91, 120; 194 NW2d 878 (1972), quoting *Sherman v United States*, 356 US 369, 380; 78 S Ct 819; 2 L Ed 2d 848 (1958) (Frankfurter, J., concurring). When we adopted the objective entrapment test in *Turner*, we explained that "the real concern" of the entrapment inquiry is to determine "whether the actions of the police were so reprehensible under the circumstances, that the Court should refuse, as a matter of public

policy, to permit a conviction to stand." *People v Turner*, 390 Mich 7, 22; 210 NW2d 336 (1973).[1]  This concern is closely intertwined with the strands of the doctrine that evolved into the inducement prong—when the police "engage[] in the impermissible manufacturing of crime," courts "should bar the prosecution in order to preserve the institutional integrity of the system of . . . criminal justice."  *Id.* at 21, quoting *United States v Russell*, 411 US 423, 445; 93 S Ct 1637; 36 L Ed 2d 366 (1973) (Stewart, J., dissenting).

However, although the two prongs of our entrapment test share the same policy rationale, they set about identifying unacceptable police behavior in different ways.  As its name suggests, the inducement prong looks to whether the police unfairly *cause* or

---

[1] Other states have provided similar reasons for adopting the objective entrapment test. See, e.g., *State v Wilkins*, 144 Vt 22, 29; 473 A2d 295 (1983) ("[T]he purpose of the entrapment defense is to deter improper governmental activity in the enforcement of the criminal laws."); *People v Barraza*, 23 Cal 3d 675, 688; 591 P2d 947 (1979) (explaining that the "public policy basis for the defense" is to deter "dubious police conduct"); *State v Taylor*, 599 P2d 496, 500 (Utah, 1979) (stating that the "historical basis" for entrapment is "the refusal to countenance a perversion of justice by government misconduct"); *Pascu v State*, 577 P2d 1064, 1067 (Alas, 1978) ("The question [in entrapment cases] is really whether that conduct falls below an acceptable standard for the fair and honorable administration of justice.").  Many of these decisions relied on the same line of United States Supreme Court concurrences and dissents that we likewise relied on in *Turner*. Compare *Turner*, 390 Mich at 17-19, citing *Russell*, 411 US at 441-442 (Stewart, J., dissenting); *Sherman*, 356 US at 378 (Frankfurter, J., concurring); and *Sorrells v United States*, 287 US 435, 453; 53 S Ct 210; 77 L Ed 413 (1932) (Roberts, J., concurring), with *Barraza*, 23 Cal 3d at 686-687; and *Wilkins*, 144 Vt at 26-28 (discussing the same line of opinions).

Because of these similarities in purpose and shared historical roots, caselaw from other states that have adopted the objective entrapment test can be a helpful guide to determining the application of the entrapment defense under Michigan law.  See *People v Jamieson*, 436 Mich 61, 87; 461 NW2d 884 (1990) (noting that "the common law of other jurisdictions" is "persuasive" in this context); *In re Estate of Von Greiff*, 509 Mich 292, 306; 984 NW2d 34 (2022) ("The common law of other jurisdictions can provide persuasive authority when developing Michigan's common law . . . .").

*instigate* a crime. It focuses on whether the police use too heavy a hand to tempt, encourage, or coerce the defendant into committing an offense. But although causing a defendant to commit a given crime is *one* form of police misconduct that may give rise to an entrapment claim, it is not the only one.

In contrast to the inducement prong, the reprehensible-conduct prong looks broadly at the ethical—or unethical—nature of the police officers' actions. It asks whether courts ought to tolerate investigative tactics, even if the defendant might have been predisposed to commit the crime. Chief Justice MICHAEL F. CAVANAGH distinguished this standard from the inducement prong in *Juillet*, explaining that entrapment may occur under the "reprehensible conduct prong" in cases where "the mere furnishing of the opportunity requires the police to commit certain criminal, dangerous, or immoral acts," "even though entrapment may not be established under a strictly causation-oriented approach[.]" *People v Juillet*, 439 Mich 34, 77-78; 475 NW2d 786 (1991) (quotation marks and citation omitted) (opinion by M. F. CAVANAGH, C.J.). See also *id*. at 77 ("[N]o matter what the defendant's past record and present inclinations to criminality, or the depths to which he has sunk in the estimation of society, *certain police conduct to ensnare him into further crime is not to be tolerated by an advanced society*.") (quotation marks and citations omitted; emphasis added).

Although these concerns have long been a part of our entrapment doctrine, we have rarely—if ever—based a finding of entrapment *exclusively* on the reprehensibility of the police conduct. As aptly set forth by the majority opinion, our jurisprudence instead has tended to analyze police conduct under the inducement prong. But even though the

3

emphasis has been on inducement, the concepts underlying reprehensible conduct have still played an important role in our caselaw.

For example, Chief Justice MICHAEL F. CAVANAGH's opinion in *Juillet* provided multiple examples of reprehensible conduct. That decision involved the consolidated appeals of two defendants—Basil Brown and Danny Juillet—who were convicted as a result of factually unrelated sting operations. See *Juillet*, 439 Mich at 42-51 (opinion by BRICKLEY, J.) (describing the facts of each underlying case). In the case of defendant Danny Juillet, Chief Justice CAVANAGH concluded that the police engaged in reprehensible conduct by employing an "unstable and disreputable" informant and undertaking "little or no meaningful supervision of [the informant's] activities," leaving him "completely free to randomly select the targets for the sting." *Id*. at 79-80 (opinion by M. F. CAVANAGH, C.J.).

And in the case of defendant Basil Brown, Chief Justice CAVANAGH argued that police officers' use of "a prostitute and drug addict," who traded sexual favors for drugs with the defendant, was likewise reprehensible. *Id*. at 81-82. The officers—in effect—directed the informant to have sex and use drugs with the defendant in order to further the investigation. See *id*. at 82. Chief Justice CAVANAGH stated that "a manufactured opportunity to commit crime may constitute entrapment if 'the mere furnishing of the opportunity requires the police to commit certain criminal, dangerous, or immoral acts.' " *Id*., quoting *People v Jamieson*, 436 Mich 61, 95-96; 461 NW2d 884 (1990) (M. F. CAVANAGH, J. concurring). In his view, the police "went to outrageous lengths to induce and orchestrate [the defendant's] continued involvement in crime." *Juillet*, 439 Mich at 81 (opinion by M. F. CAVANAGH, C.J.).

4

But these two cases provide only a small sample of the type of police misconduct that might form the basis for a reprehensible-conduct entrapment claim. One common theme in entrapment cases is the targeting of vulnerable individuals or groups, such as recovering drug addicts. See, e.g., *Pascu v State*, 577 P2d 1064, 1068 (Alas, 1978) (finding entrapment when the informant "took advantage of [the defendant's] own addiction and withdrawal pains by offering to give him enough heroin to 'make him well' "); *Commonwealth v Lucci*, 443 Pa Super 431, 445; 662 A2d 1 (1995) ("It is hard to imagine what public policy is served by allowing the police or their agents to approach recovering drug addicts, newly discharged from rehabilitation programs to which they have submitted of their own free will, to lure them back into narcotics use."). See also *Jamieson*, 436 Mich at 107 (ARCHER, J., dissenting) (arguing that "undercover police officers [trying] to entice recovering addicts with narcotics at the entrance of a substance abuse clinic" would be "a completely inappropriate attempt to prey on the weakness of a target"). Other courts have expressed disdain for the exploitation of romantic or sexual relationships. See, e.g., *State v Taylor*, 599 P2d 496, 503-504 (Utah, 1979) (holding that the police committed "a perversion of the proper standards of administration of criminal law" when they used an addict informant to ask her recent romantic partner to procure heroin to ease her withdrawal symptoms).[2]

---

[2] Our decision in *People v McCord*, 76 Mich 200; 42 NW 1106 (1889), though it was decided long before the modern entrapment framework was developed, can also serve as an example of reprehensible conduct. In that case, the defendant was induced by a private detective to burglarize a store, where he was shot and severely beaten by the store's owner and several armed associates. *Id*. at 201. We agreed that the defendant was entitled to acquittal of the charge of breaking and entering, describing the case as "one of the most disgraceful instances of criminal contrivance to induce a man to commit a crime in order

5

The factors listed here are not intended to be comprehensive. Cf. *Juillet*, 439 Mich at 57 (opinion by BRICKLEY, J.) (providing a nonexclusive list of "important factors that courts have considered"). "Entrapment is a highly fact-intensive defense," see *State v Torres*, 16 P3d 1242, 1244; 2000 UT 100 (2000) (quotation marks and citation omitted), the full contours of which can only be defined "through an accumulation of cases" over time, see *People v D'Angelo*, 401 Mich 167, 175; 257 NW2d 655 (1977). See also *Price v High Pointe Oil Co, Inc*, 493 Mich 238, 243; 828 NW2d 660 (2013) ("The common law is always a work in progress and typically develops incrementally, . . . gradually evolving as individual disputes are decided . . . ."). Moreover, many factors may be *indicative of* entrapment—either in general, or on the facts of a given case—while not being sufficient to establish the defense alone. See *Juillet*, 439 Mich at 64-65 (opinion by BRICKLEY, J.) (acknowledging that "there was *some* pressure" on defendant Brown and that "sexual favors" were involved, but concluding that he was not entrapped) (emphasis added).

Amicus Criminal Defense Attorneys of Michigan (CDAM) describes several other Genesee Home Oppression Strike Team (GHOST) cases, the facts of which could justify an examination by trial courts for the existence of reprehensible conduct.[3] The CDAM

---

to get him convicted that has ever been before us" and stating that "the cruel and brutal reception of the [defendant] is beyond palliation." *Id*. at 205-206.

[3] CDAM noted that in *People v Newcomb*, Charlevoix Circuit Court, Docket No. 24-592-14-FH, the trial court concluded that the defendant was entrapped under the reprehensible-conduct prong. The trial court found that "the officer was the first to bring up sexual talk . . . . The officer was the first to suggest a meet up . . . . The officer actually did that twice during the back and forth that occurred over several days."

I do not speculate on the merits of CDAM's cases, many of which are pending before this Court or the Court of Appeals. I rely solely on the descriptions and facts in CDAM's brief.

brief, for example, describes cases where the defendants responded to a decoy profile posted on completely lawful dating websites and highlights that placing decoys on lawful LGBTQ dating sites appears to be a particularly common practice for GHOST operations. See, e.g., *People v Voyles*, ___ Mich ___; 20 NW3d 868 (2025); *People v Lakatos*, unpublished order of the Court of Appeals, issued May 21, 2026 (Docket No. 366091). See also *People v Newby*, unpublished per curiam opinion of the Court of Appeals, issued February 19, 2025 (Docket No. 372314) (concerning a sting on the "Sniffies" platform[4] initiated by the Ohio Internet Crimes Against Children Task Force but prosecuted in Michigan state court). Although police certainly have a legitimate interest in detecting and preventing sexual abuse within the LGBTQ community, disproportionate targeting on these platforms could raise concerns. The identity of the subjects of an investigative scheme—including the possibility that an investigation singles out a specific group when compared to the general population—could be relevant to determining whether "the police engaged in conduct so reprehensible that it cannot be tolerated." *People v Johnson*, 466 Mich 491, 498; 647 NW2d 480 (2002).

In summary, the tactics used by the investigators in these cases could evince an intent "to induce [the defendants] to commit crimes in order to get up a prosecution against them," the very "scandalous and reprehensible" behavior the entrapment doctrine is intended to prevent. *Saunders v People*, 38 Mich 218, 223 (1878) (CAMPBELL, C.J., concurring). I take no position on whether the reprehensible-conduct standard is met on

---

[4] Sniffies describes itself as a "[m]ap-based cruising app for gay, bi, trans, and curious cruisers (18+)." See <https://x.com/sniffiesapp?lang=en> (accessed July 25, 2026) [https://perma.cc/5QQQ-VNME].

7

the facts of this case. But, in my view, the lower courts, members of the bar, and the police should factor this into consideration when approaching future similar law enforcement operations.

## II. ESCALATION

The idea that police can improperly escalate criminal conduct is based on another key insight of the objective entrapment test—that it is unfair and unworkable for entrapment to turn on an individual defendant's innocence or predisposition. See *Turner*, 390 Mich at 20, quoting *Russell*, 411 US at 442 (Stewart, J., dissenting) ("The purpose of the entrapment defense, then, cannot be to protect persons who are 'otherwise innocent.' Rather, it must be to prohibit unlawful governmental activity in instigating crime."). Indeed, the defense only becomes relevant once the defendant has committed a crime. See *Turner*, 390 Mich at 20 ("The very fact that [defendant] has committed an act that Congress has determined to be illegal demonstrates conclusively that he is not innocent of the offense."). Recognizing this, the entrapment doctrine protects people whose conduct might not be completely legal, but who are induced or persuaded to escalate their criminal behavior.

As the majority notes, our caselaw has previously addressed escalatory police conduct under the unlawful-inducement prong of our entrapment jurisprudence. See *Johnson*, 466 Mich at 499 (listing "whether there existed any government procedures that tended to escalate the criminal culpability of the defendant" among the factors to be considered under this prong). It is notable that, today, the majority acknowledges that escalation is also relevant to the reprehensible-conduct prong as well.

8

The trial court, on remand, will need to consider "the escalatory nature of the police conduct here . . . under the legal standard that we clarify today." Because of this, I offer some supplemental background regarding escalatory police conduct that I hope will be helpful in guiding our courts in their decision-making.

The most recognizable cases of escalation occur when police officers *know* that the defendant is committing one crime, but induce them to commit another more serious crime. See, e.g., *People v Killian*, 117 Mich App 220, 223; 323 NW2d 660 (1982) ("Because police knew that defendant was not a cocaine dealer, yet induced him to make substantial cocaine sales, we must conclude that police agents impermissibly manufactured or instigated a crime."). In contrast to the escalation that occurred in *Killian*, there is no escalation when "the government simply provide[s] defendant with an additional opportunity to commit a crime that he had previously committed." *Johnson*, 466 Mich at 503.

The analysis of whether police conduct has escalated criminal conduct is distinct from the predisposition analysis forbidden under our objective entrapment test.[5] A judge must focus on the police officers' conduct—not the defendant's state of mind. See *Jamieson*, 436 Mich at 72. However, "that conduct is not to be viewed in a vacuum." *Id*. at 74, quoting *People v Barraza*, 23 Cal 3d 675, 690; 591 P2d 947 (1979). Factors like the defendant's criminal history may be relevant if they influenced—or should have influenced—the police officer's behavior. For example, in *Killian*, the issue was not that

---

[5] Some commentators have suggested that, under the objective test, defendants may introduce evidence of their *lack of predisposition* to show that they were induced to commit the crime at issue. See Marcus, The Entrapment Defense (5th ed, 2025 electronic version), § 3.02 (discussing *People v Crawford*, 121 Mich App 306; 328 NW2d 377 (1982)).

9

the defendant had no history of selling cocaine. Rather, the concern was that the police *knew* the defendant was not a cocaine dealer, but induced him to participate in a cocaine transaction all the same. Cf. *Turner*, 390 Mich at 23 (criticizing the police for conducting a heroin sting after a "[prior] investigation [of defendant had] turned up nothing").

But criminal history is not the only factor that might bear on an escalation analysis. Many other states with objective entrapment tests allow courts to look at "the transactions preceding the offense, the suspect's response to the inducements of the officer, the gravity of the crime, and the difficulty of detecting instances of its commission" when assessing the police officers' conduct. *Barraza*, 23 Cal 3d at 690. See also *Grossman v State*, 457 P2d 226, 230 (Alas, 1969) (same); *State v Taylor*, 599 P2d 496, 503 (Utah, 1979) (same); *State v Mullen*, 216 NW2d 375, 382-383 (Iowa, 1974) ("In adopting an objective test we do not intimate [that] the transactional negotiations and conduct of the government official (or his agent) and the defendant should be ignored. What was said, and the defendant's response to the inducements, should all be considered in judging what the effect of the government conduct would be on normally law-abiding persons."). See also *Sherman*, 356 US at 384-385 (Frankfurter, J., concurring in the result) ("Evidence of the setting in which the inducement took place is of course highly relevant in judging its likely effect[.]").

Other factors that might bear on a court's escalation analysis include the nature of the sting operation and whether the communications with defendant were designed to appeal to people engaged in lawful conduct or unlawful conduct. A court could consider whether the sting was targeted at those engaging in unlawful conduct in the first place and whether there was a likelihood that those engaged in unlawful conduct would be likely to engage in the more serious conduct or were instead induced to commit the more serious

10

crime by the police. In sex-crimes stings like the one here, this could involve looking at the nature of the platform and the contents of the decoy profile to determine whether they were calculated to appeal to people seeking to have sex with minors. These considerations are relevant in examining "the transactions preceding the offense," see *Barraza*, 23 Cal 3d at 690, or "the setting in which the inducement took place," see *Sherman*, 356 US at 384 (Frankfurter, J., concurring in the result).

A court might also examine a defendant's reaction to the law enforcement outreach. For example, did a defendant give in after token opposition, or did the officers continue to pursue defendant after repeated refusals? Cf. *People v White*, 411 Mich 366, 390; 308 NW2d 128 (1981) (concluding that the defendant was entrapped when, among other things, after "defendant did not show up at the meeting place, the officer again sought him out, not once but twice").

Finally, the needs and purposes of the investigation also matter. See *Barraza*, 23 Cal 3d at 690 (noting that "the gravity of the crime, and the difficulty of detecting instances of its commission," are relevant factors). So, for example, law enforcement may delay a defendant's arrest in order to collect additional evidence against a defendant or his coconspirators. See *People v Ealy*, 222 Mich App 508, 511; 564 NW2d 168 (1997).

These factors are not the only ones relevant to the escalation analysis, but I hope they will serve as helpful examples to our trial courts.

Elizabeth M. Welch

11

# STATE OF MICHIGAN

## SUPREME COURT

PEOPLE OF THE STATE OF MICHIGAN,

      Plaintiff-Appellee,

v                                           No. 167920

JAYNEEL RAVINDRA JADE,

      Defendant-Appellant.

_____

ZAHRA, J. (*concurring in part and dissenting in part*).

In this case involving a sting operation by law enforcement, the Court elects to review Michigan's jurisprudence relating to entrapment. To a limited extent, I agree with the majority opinion. First, I agree that a trial court's factual findings in an entrapment hearing are reviewed for clear error, while its ultimate legal determination as to whether entrapment occurred and any other legal determinations are reviewed de novo. Second, the ultimate determination of entrapment requires that a trial court conclude that either (1) the police engaged in conduct that would induce a law-abiding person in similar circumstances to commit the offense, or (2) the police conduct was so reprehensible that it cannot be tolerated.[1] I agree with the majority opinion that the phrase "ready and willing" is not an added element to the inducement prong. In regard to the inquiry whether there was reprehensible police conduct, I also agree with the majority opinion that conduct that seeks to escalate a defendant's criminal liability is relevant to whether police conduct was

---

[1] *People v Johnson*, 466 Mich 491, 498; 647 NW2d 480 (2002).

so reprehensible that it cannot be tolerated. While I conclude that the prosecution has presented a persuasive argument that police conduct *in this case* was not so reprehensible as to be intolerable,[2] I nonetheless agree in part with the majority's decision to remand this case to the trial court.[3] The trial court appears to have considered only whether there was

---

[2] I emphasize "in this case" because, as informed by amicus Criminal Defense Attorneys of Michigan (CDAM), the Genesee Human Oppression Strike Team (GHOST) created something of a template for online sex sting operations, which has since been used by law enforcement throughout Michigan. Mid-Michigan Now, *GHOST Has Arrested Nearly 200 Alleged Predators Since Its Creation, Says Genesee County Sheriff* (August 9, 2023) <https://midmichigannow.com/news/local/ghost-has-arrested-nearly-200-alleged-predators-since-its-creation-says-genesee-county-sheriff> (accessed May 9, 2026); see Gagnon, *Sheriff Details Out-County GHOST Operations, Human Trafficking Arrests*, Genesee County View (September 16, 2021) <https://flinttownshipview.mihomepaper.com/articles/sheriff-details-out-county-ghost-operations-human-trafficking-arrests/> (accessed May 9, 2026) [https://perma.cc/944C-7QQ7]. CDAM argues that these operations were "nearly identical to that in [this case]," but its brief all but dispels this assertion by referencing cases involving far more aggressive and deceptive police conduct than that which is present in this case. For example, CDAM cites one case in which the undercover police officer who spoke to the suspect "never said his age." Instead, the officer made a single cursory and cryptic statement about his cousin getting a hotel room ("[M]y cousin finally got the room for me I guess you have to be older than 15 to get a room[.]"). Some of the cases cited by CDAM required very difficult legal conclusions that I believe our trial courts are in the best position to make at the onset. The Court now clarifies that those legal conclusions are subject to nondeferential de novo review and ensures that reviewing courts attend to these cases with greater scrutiny.

[3] One aspect of the majority opinion regarding the reprehensible-police-misconduct prong of entrapment is concerning. The majority opinion, citing a separate opinion in *People v Juillet*, 439 Mich 34, 77-78; 475 NW2d 786 (1991) (opinion by M. F. CAVANAGH, C.J.), states as law that "the reprehensible-conduct prong may be met 'without regard to causation,' so long as the conduct in question is egregious enough to be intolerable by a civilized society." But this Court has never affirmed this proposition as a matter of law, and the lead opinion in *Juillet* expressed concern that removing causation from this prong of entrapment would "embark the courts of this state on a review of 'all police conduct that can or will in the future, on the basis of the shock level of an individual jurist, be considered "reprehensible." ' " *Juillet*, 439 Mich at 59 (opinion by BRICKLEY, J.), quoting *People v Jamieson*, 436 Mich 61, 76; 461 NW2d 884 (1990). Perhaps there may be some extremely rare instances where police conduct is tantamount to a "constitutional due process violation," *Juillet*, 439 Mich at 109 (GRIFFIN, J., concurring in part and dissenting in part),

2

police conduct that escalated defendant's sentence, without considering whether there was police conduct that escalated a misdemeanor charge to the felony crimes charged. The trial court's analysis is based on a version of "sentencing manipulation,"[4] which is a doctrine "based on police misconduct" that may also be relevant to showing reprehensible police conduct through an escalation of charged crimes.[5] Accordingly, I would remand to the trial court on this limited basis.

My agreement with the majority opinion ends there. Contrary to the direction provided in the majority opinion, I would apply the clarified standard of review and conclude that the Court of Appeals correctly affirmed the trial court's legal conclusion that defendant did not establish that police misconduct would have induced a law-abiding person under similar circumstances to commit the crimes charged. In particular, the police conduct that defendant argues escalated his criminal liability cannot reasonably be viewed as an incentive at all, let alone as an inducement for a normally law-abiding person to commit the crimes charged.

---

in which causation need not be shown, but such instances are all but impossible to imagine. More importantly, causation is not at issue in this case, which begs the question why the majority has included this dictum in its opinion. In sum, whether the reprehensible-police-misconduct prong may be met without regard to causation is an undecided issue of law that is not even at issue in this case.

[4] See *People v Claypool*, 470 Mich 715, 742; 684 NW2d 278 (2004) (M. F. CAVANAGH, J., concurring in part and dissenting in part), quoting *United States v Lora*, 129 F Supp 2d 77, 89-90 (D Mass, 2001), quoting Weil, *In Partial Defense of Sentencing Entrapment*, 7 Fed Sent'g Rep 172, 174 (1995) (quotation marks omitted).

[5] *Claypool*, 470 Mich at 718 (opinion of the Court).

The police conduct relating to escalation in this case is not relevant to the inducement prong of entrapment. Escalation is typically present when police engage in sentencing manipulation or sentencing entrapment. One commentator provides helpful examples:

> An example of "sentencing entrapment" would be when a government agent offers a kilogram of cocaine to a person who has previously purchased only gram or "user" amounts, for the purpose of increasing the amount of drugs for which he ultimately will be held accountable. On the other hand, an example of "sentencing manipulation" would be when an undercover agent continues to engage in undercover drug purchases with a defendant, thereby stretching out an investigation which could have concluded earlier, for the sole purpose of increasing the defendant's sentencing exposure, or when an undercover agent insists that a defendant "cook" powder cocaine into "crack," well-knowing that sentences for dealing in crack are significantly higher than sentences for dealing in powder cocaine.[6]

In the first two examples, there is evidence of police conduct that may induce a normally law-abiding person to commit a crime because the police had previously provided that person with the false comfort of escaping criminal liability. But in the third example, which is an apt comparison to this case, no assurance has been provided which would induce a normally law-abiding person to commit the crime. To be sure, the insistence by police to commit a certain crime may be relevant to inducement, but in this context, escalation alone is not an inducement. In this case, police officers tempted defendant with an offer for a young but adult prostitute that he clearly desired. The police then informed him that the prostitute was not an adult, which made the offer less desirable to defendant. The police's conduct in changing the offer did not escalate defendant's desire to commit

---

[6] *Claypool*, 470 Mich at 742 (M. F. CAVANAGH, J., concurring in part), quoting *Lora*, 129 F Supp 2d at 89-90, quoting Weil, *In Partial Defense of Sentencing Entrapment*, 7 Fed Sent'g Rep at 174 (some quotation marks omitted).

4

the crimes charged. Rather, the conduct is akin to offering someone what looks like an ideal apple only to then inform the person that it's bruised fruit.[7]

Defendant is correct that the police could have charged him with engaging the services of a prostitute, MCL 750.449a(2), before informing him that the prostitute was a minor. Defendant's first response to this information, "[g]ot to be 16," proved noncommittal as the police continued the operation until more charges could be filed, escalating defendant's conduct to the charged offenses of child sexually abusive activity, MCL 750.145c(2)(a), accosting a child for immoral purposes, MCL 750.145a, and using a computer to commit those offenses, MCL 752.796. But what is most pertinent to the issue before the Court is that the continued operation by law enforcement did not in any sense induce or make defendant more "ready and willing" to commit the crimes charged. In sum, the escalation in this case only involves potential police misconduct, which is determined under the reprehensible-police-misconduct prong of entrapment.

I conclude that the trial court correctly ruled in regard to the inducement prong and that the Court of Appeals reached the correct result in affirming the trial court's ruling.[8]

---

[7] As earlier mentioned, however, I do agree with the majority that this conduct may nonetheless be relevant to establishing reprehensible police misconduct, and I would remand to the trial court for consideration on that limited basis.

[8] The trial court carefully evaluated the critical factors that courts have traditionally considered when determining whether a defendant was unlawfully induced:

> (1) whether there existed appeals to the defendant's sympathy as a friend, (2) whether the defendant had been known to commit the crime with which he was charged, (3) whether there were any long time lapses between the investigation and the arrest, (4) whether there existed any inducements that would make the commission of a crime unusually attractive to a hypothetical law-abiding [person], (5) whether there were offers of excessive consideration or other enticement, (6) whether there was a guarantee that the

Specifically, the trial court found that there was no appeal to defendant's sympathy, no appreciable time lapse between the investigation and the arrest, no inducement that would make the commission of a crime unusually attractive to a hypothetical law-abiding person, no offer of excessive consideration or other enticement, no guarantee that the acts alleged as crimes were not illegal, no government pressure, no (free of charge) sexual favors, and no threats of arrest, and defendant was not targeted by the investigation. These factors all clearly favor the conclusion that police conduct did not induce defendant to commit the charged crimes.

The trial court found that the remaining factors suggesting inducement included that defendant was not known to commit the crimes with which he was charged, that government procedures tended to escalate defendant's criminal culpability, and that there was police control over the agent. Again, while I believe that government procedures tended to escalate defendant's criminal culpability, I cannot conclude that the escalation in this case *induced* defendant to commit the crimes charged. The factors suggesting inducement only provide a marginal basis to reach the legal conclusion that police conduct induced defendant to commit the crimes charged.

A "normally law-abiding person" in this state does not solicit prostitution, which is a misdemeanor. But even setting that aside, defendant was certainly aware that sex with

---

acts alleged as crimes were not illegal, (7) whether, and to what extent, any government pressure existed, (8) whether there existed sexual favors, (9) whether there were any threats of arrest, (10) whether there existed any government procedures that tended to escalate the criminal culpability of the defendant, (11) whether there was police control over any informant, and (12) whether the investigation was targeted. [*Johnson*, 466 Mich at 498-499.]

an underage prostitute was a serious offense and expressed reluctance to commit that offense. That reluctance is what one would expect from a "normally law-abiding person." Yet defendant overcame his reluctance to engage a minor for sex without any police inducement at all. Contrary to the majority's determination, the conduct specified as going beyond offering the "mere opportunity" did not, in any sense, "induce" defendant to commit that crime. Here, law enforcement merely informed defendant that the prostitute was 15 years old. Defendant clearly preferred to solicit a prostitute who was over 16 years old, but defendant nonetheless remained ready and willing to solicit a 15-year-old. Accordingly, I would affirm the trial court's conclusion that the police did not induce defendant to commit the crimes charged and would remand to the trial court to consider whether the police conduct resulted in an escalation of charges against defendant under the reprehensible-police-misconduct prong.

Brian K. Zahra